UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| **ARBORETUM NURSING AND** | § | |
| **REHABILITATION CENTER OF** | § | |
| **WINNIE, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **CIVIL ACTION NO. V-10-69** |
| **v.** | § | |
| | § | |
| **HOMELAND INSURANCE COMPANY** | § | |
| **OF NEW YORK,** | § | |
| | § | |
| **Defendant.** | § | |

**MEMORANDUM OPINION AND ORDER**

This action is an insurance coverage dispute brought by Plaintiff Arboretum Nursing and

Rehabilitation Center of Winnie, Inc. ("Arboretum") seeking damages for breach of contract and

declaratory judgment that a professional liability policy issued by Defendant Homeland

Insurance Company of New York ("Homeland") provides coverage as to claims asserted against

Arboretum in a Texas state court action styled *Keri Hampton, Individually and as Independent*

*Executrix of the Estate of Henning Thomsen, Deceased v. Arboretum Nursing and Rehabilitation*

*Center of Winnie, Inc., and Cynthia Reber*, Cause No. 48420, in the 356th Judicial District Court

in Hardin County, Texas (the "Underlying Suit").

Now pending before the Court are Homeland and Arboretum's cross motions for

summary judgment (Dkt. Nos. 20 & 22, respectively), to which the Parties have filed responses,

replies, and briefs in support (Dkt. Nos. 21, 25, 26, 27, 28).

**I. Factual and Procedural Background**

Homeland provided Arboretum with professional liability protection through policy

number MPP-1022-07, effective February 2, 2007 to February 2, 2008 (the "Policy") (Dkt. No.

21, Ex. 1).[1] The Policy was a claims-made-and-reported policy with a retroactive date of June 1,

1999 and provided in relevant part as follows:

> The Underwriter will pay up to the applicable Limit of Liability on behalf of the
> Insured any Loss that the Insured is legally obligated to pay as a result of any
> covered Claim for Professional Services Wrongful Act happening on or after the
> Retroactive Date [June 1, 1999], provided, that the Claim is first made against the
> Insured during the Policy Period [February 2, 2007 to February 2, 2008] . . . .

(Policy ¶ I(A).)

On January 4, 2008, the Original Petition in the Underlying Lawsuit (hereinafter

"Petition") was filed, alleging a survival cause of action under TEX. CIV. PRAC & REM. CODE §

71.021, wrongful death under TEX. CIV. PRAC & REM. CODE § 71.001, and homicide liability

under article 26, § 16 of the Texas Constitution. (Pet., Dkt. No. 22, Ex. 2.) In sum, the

Underlying Lawsuit alleged that Henning Thomsen ("Mr. Thomsen") never recovered from

injuries he sustained after he was assaulted while he was a resident patient of Arboretum. As a

result of the assault and other neglect allegedly inflicted upon him while under Arboretum's care,

Mr. Thomsen died an unpleasant and painful death on June 21, 2006.

On January 16, 2008, Arboretum tendered the Underlying Lawsuit to Homeland,

demanding that Homeland defend and indemnify it for the claims made. On February 15, 2008,

Homeland sent Arboretum a letter denying coverage under the Policy and refusing to defend

Arboretum in the Underlying Lawsuit on the basis of a Prior Knowledge Exclusion contained in

the Policy, which generally provides that coverage is precluded for claims arising from a

wrongful act that occurred before the inception of the Policy on February 2, 2007, if Arboretum

knew or should have known that the matter could result in a claim.

---

1. This was a first policy Homeland issued to Arboretum. Before that time, Arboretum was insured under
the Oasis Captive Insurance Program until February 2, 2006, followed by a Lloyd's Policy from February 2, 2006 to
February 2, 2007.

Arboretum eventually settled the Underlying Lawsuit and then brought this action alleging that Homeland breached its duties to defend and to indemnify under the Policy. Arboretum now seeks damages for breach of contract and declaratory judgment that the Policy provided coverage against the Underlying Lawsuit.

## II. Summary Judgment Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Christopher Village, Ltd. v. Retsinas*, 190 F.3d 310, 314 (5th Cir. 1999). "For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir. 1995); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). To prevent summary judgment, the non-movant must "respond by setting forth specific facts" that indicate a genuine issue of material fact. *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 505 (5th Cir. 1999).

When considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the non-movant. *See Samuel v. Holmes*, 138 F.3d 173, 176 (5th Cir. 1998); *Texas v. Thompson*, 70 F.3d 390, 392 (5th Cir. 1995). "[T]he court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion." *Int'l Shortstop, Inc. v. Rally's,*

3

*Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991). However, the non-movant cannot avoid summary judgment by presenting only "conclusory allegations" or "unsubstantiated assertions," such as the bare allegations of a complaint, but must present sufficient evidence, such as sworn testimony in a deposition or affidavit, to create a genuine issue of material fact as to the claim asserted. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). "Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that 'the better course would be to proceed to a full trial.'" *Freeman v. U.S.*, 2005 WL 3132185, *2 (S.D. Tex. Nov. 22, 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

## III. Analysis

An insurer in a liability insurance policy assumes two duties: (1) to defend the insured against covered lawsuits and (2) to indemnify the insured against all covered claims and judgments. *D.R. Horton–Tex., Ltd. v. Markel Int'l Ins. Co., Ltd.*, 300 S.W.3d 740, 743 (Tex. 2009). The duties to defend and indemnify are distinct, and one may exist without the other. *Id.*; *see also Colony Ins. Co. v. Peachtree Const., Ltd.*, 647 F.3d 248, 253–54 (5th Cir. 2011).

Homeland argues that it is entitled to summary judgment on Arboretum's duty to defend and duty to indemnify claims because the Underlying Lawsuit alleges treatment of Mr. Thomsen that occurred before the Policy's February 2, 2007 inception date, and a reasonable representative of Arboretum knew or should have known that a lawsuit might be filed against Arboretum at the time the Policy was signed. Thus, under the Prior Knowledge Exclusion, Homeland argues it had no duty to defend or indemnify Arboretum in the Underlying Lawsuit. Arboretum acknowledges that the Underlying Lawsuit alleges treatment of Mr. Thomsen that necessarily occurred before his death on June 21, 2006 and also before the Policy's inception

date. However, Arboretum argues that it is nonetheless entitled to summary judgment on its duty

to defend claims because the Petition in the Underlying Lawsuit does not allege facts that trigger

the Prior Knowledge Exclusion.

### A. Duty to Defend

#### 1. Legal Standard

An insurer's duty to defend is determined by the eight-corners rule. *King v. Dallas Fire

Ins. Co.*, 85 S.W.3d 185, 187 (Tex. 2002). As the Texas Supreme Court has stated, "An insurer's

duty to defend is determined solely by the allegations in the pleadings and the language of the

insurance policy." *Id.* "In performing its eight-corners review, a court may not read facts into the

pleadings, look outside the pleadings, or speculate as to factual scenarios that might trigger

coverage or create an ambiguity." *Gilbane Bldg. Co. v. Admiral Ins. Co.*, 664 F.3d 589, 596 (5th

Cir. 2011). Whether the insurer has a duty to defend is determined as a matter of law because the

court need only examine the pleadings and the policy to make the decision. *Westport Ins. Corp.

v. Atchley, Russell, Waldrop & Hlavinka, LLP*, 267 F. Supp. 2d 601, 606 (E.D. Tex. 2003 (citing

*Nat'l Union Fire Ins. Co. v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex.

1997)). The insurer has the burden of establishing the applicability of any exclusion, TEX. INS.

CODE § 554.002, and courts must "resolve all doubts regarding the duty to defend in favor of the

duty." *King*, 85 S.W.3d at 187.

#### 2. The Insurance Policy

The determinative factor in considering the Parties' motions is whether the Prior

Knowledge Exclusion applies to bar coverage to Arboretum for the Underlying Lawsuit. The

Prior Knowledge Exclusion provides as follows:

> (D) Except as otherwise expressly provided in this Policy, this Policy does not
> apply to, and the Underwriter will not pay Loss, including Defense Expenses, for

any Claim based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

> (1) Wrongful Act or Occurrence that happened before the Retroactive Date [June 1, 1999] if applicable, or after the Retroactive Date if, on the Inception Date of this Policy [February 2, 2007], the Insured knew, had been told, should have known or had notified a prior professional liability insurer or administrator of any other risk transfer instrument that such Wrongful Act or Occurrence would or could result in a Claim.

(Policy ¶ III(D)(1).)

The Policy defines "Claim" as "a written demand received by an Insured for monetary damages resulting from a Wrongful Act or an Occurrence." (*Id.* ¶ II(D).) "Insured" is defined in part as "any Employee or Volunteer; but only when such Employee or Volunteer is acting within the capacity and scope of his or her duties as such for the Named Insured." (*Id.* ¶ II(Q)(2).)

The Policy further states that "[i]n the event of any material untruth, misrepresentation or omission in connection with any of the particulars or statements in the Application, this Policy shall be void with respect to any Insured who knew of such untruth, misrepresentation or omission or to whom such knowledge is imputed." (*Id.* at 39, ¶ IV(P).) Finally, the Policy contains an imputation of knowledge clause providing that "[n]o knowledge or information possessed by any Insured shall be imputed to any other Insured, except for material facts or information known to the person or persons who signed the [Policy] Application." (*Id.*)

The Eastern District of Texas construed a similar insurance contract in *Executive Risk Indemnity v. Memorial Health System of East Texas*, No. 9:03-cv-276 (E.D. Tex. Jun. 29, 2004). In that action, Executive Risk defended Memorial in a medical negligence suit, later funded a settlement, and then sued Memorial for a declaratory judgment that it owed no duty to defend or indemnify. *Id.* at 1. Like Homeland here, Executive Risk claimed that a prior acts exclusion similar to the Prior Knowledge Exclusion in this case precluded coverage. *Id.* During a jury trial

6

on this issue, the jury was presented with two interrogatories. The first asked whether Executive Risk proved that, as of the date the policy was issued, "'the Insured . . . should have known that a Professional Services Wrongful Act or Occurrence, with respect to the treatment of [the decedent patient], would or could result in a Claim[.]'" *Id.* at 2. The second question asked whether Executive Risk proved that, as of the date the policy was issued, Memorial's president and CEO "'should have known that a Professional Services Wrongful Act or Occurrence, with respect to the treatment of [the decedent patient], would or could result in a Claim[.]'" *Id.*

With respect to the first question, which the jury answered in the affirmative, the jury was instructed that the "Insured" included, for the purpose of the Insured's knowledge, Memorial's many employees or agents who helped treat the decedent patient. The second question, which the jury answered in the negative, was submitted at Memorial's request based on its argument that an imputation of knowledge clause identical to the one contained in ¶ IV(P) of Homeland's Policy required that the person who signed Memorial's policy application (*i.e.*, its president and CEO) must have had knowledge of the prior acts at the time he signed the application. *Id.* at 3–4. Like Arboretum here, Memorial argued that the imputation of knowledge clause meant that "even if various nurses, respiratory therapists, and other employees should have known that a suit 'would or could result in a Claim' . . . that knowledge could not be imputed to Memorial." *Id.* at 8. According to Memorial, "Only if the person who signed the application . . . 'should have known' does the exclusion apply." *Id.*

The court agreed with Memorial and determined that because the jury found that Memorial's president and CEO did not possess knowledge of the prior acts at the time he signed the policy application, Executive Risk had a duty to both defend and indemnify Memorial. *Id.* at 11. In reaching this conclusion, the court recognized that other insurance companies addressing

the issue of imputed knowledge have taken an "expansive approach" but concluded that "[a]ny limitation is a result of [Executive Risk's] drafting of the policy language." *Id.* at 10–11. (citing *Coregis Ins. Co. v. Lyford*, 21 F. Supp. 2d 695 (S.D. Tex. 1998) (holding that a prior knowledge exclusion stating that the policy did not apply if "any insured" knew or could have reasonably foreseen a claim or suit arising out of any act or omission prior to the effective date of the policy, barred coverage for all insureds)).

Here, much like *Executive Risk* and unlike *Coregis*, the Policy does not provide that the Prior Knowledge Exclusion applies if "any insured" knew or should have known about an impending claim. Instead, the Policy states that the exclusion applies if "the Insured"—which Texas courts have interpreted to mean "the insured against whom a claim is being made under the policy"—has such knowledge. *See United Nat'l. Ins. Co. v. Union Pac. RR Co.*, 2005 WL 1719727, *4 (S.D. Tex. May 27, 2005) (citing *Bituminous Cas. Corp. v. Maxey*, 110 S.W.3d 203, 212 (Tex. App.—Houston [1 Dist.] 2003, pet. denied)). Thus, like the Eastern District of Texas in *Executive Risk*, the Court finds that the only person whose knowledge was imputable to Arboretum under the Policy was the person who signed the Policy application— *i.e.*, Arboretum President Byron M. Burris II ("Burris").

### 3. The Original Petition

The Petition in the Underlying Lawsuit brought survival, wrongful death, and homicide liability causes of action against Arboretum based on its alleged professional negligence, claiming as follows:

> At all times material hereto, Decedent Henning Thomsen was a resident patient at Defendant Arboretum Nursing and Rehabilitation Center of Winnie, Inc.'s facility in Winnie, Texas, during which time Defendant [Cynthia] Reber was employed by Defendant Arboretum as administrator [the facility's leading management official] (Defendants Arboretum and Reber are hereinafter collectively referred to as "Defendant"). Decedent Henning Thomsen sought Defendant's professional

expertise, judgment, skill, competence, advice and treatment. At the time of his admission to Defendant's facility in Winnie, Texas, Decedent was suffering from dementia and required full-time assistance for his day-to-day care. Despite his mental and physical condition, Defendant failed to implement, enforce, and/or carry out a care plan for Decedent to prevent and minimize dehydration and diabetic complications, and to ensure his safety. As a result, Decedent was hospitalized on more than one occasion with dehydration. Furthermore, a patient at the Arboretum with a known propensity toward violence beat Decedent severely on the side of the head. Shortly thereafter, Decedent suffered a stroke as a result of the beating. On his last day at the Arboretum, Plaintiff found Decedent slumped over in a wheelchair, covered with vomit, feverish, and wheezing. At Plaintiff's insistence, Decedent was transported by ambulance to a hospital for treatment. Decedent never recovered from the injuries and neglect inflicted upon him while residing at the Arboretum, and died June 21, 2006. Defendant's negligence was the proximate cause of the Decedent's injuries and damages which are described below.

(Pet. ¶ V.)

The Petition further alleged "gross negligence by failing to protect Decedent from fall and pressure sore risks, as more fully identified above. Despite the Defendant's actual, subjective awareness of the risk involved, Defendant proceeded to act with conscious indifference to the rights, safety, and welfare of others, including the Decedent." (*Id.* ¶ VI.) Finally, the Petition listed other failures by Arboretum with respect to Mr. Thomsen's care, sounding in negligence and gross negligence:

a. Failing to implement and/or carry out a care plan for Decedent for prevention of dehydration and injury;
b. Failing to perform ongoing nursing assessments to identify actual and potential problems relating to Decedent's health and safety;
c. Failing to make appropriate nursing diagnoses based on ongoing nursing assessments;
d. Failing to develop a comprehensive plan of care for problem areas, goals for positive outcomes and specific nursing interventions to prevent adverse outcomes from known problem areas;
e. Failing to implement the plan of care on Decedent's behalf;
f. Failure to evaluate Decedent's response to the implementation of the plan of care and through ongoing assessments;
g. Failure to update the plan of care consistent with Decedent's response thereto.

(*Id.*)

### 3. Analysis

In order for the Prior Knowledge Exclusion to apply to Homeland's duty to defend, the Petition in the Underlying Lawsuit must allege that, on or before February 2, 2007, Burris "knew, had been told, [or] should have known" that the substantive allegations detailed in the Petition "would or could result" in the filing of a claim against Arboretum, or that Arboretum had given notice of same to a prior carrier. Here, the Petition pleads generally that "Defendant and its agents, servants[,] and employees knew or should have known that an elderly person in the condition that Decedent was in immediately prior to the incident was subject to dehydration, as Plaintiff was, and was unable to protect himself from other patients." (Pet. ¶ VI.) The Petition also alleges that Arboretum had "actual, subjective awareness of the risks involved" but "proceeded to act with conscious indifference to the rights, safety, and welfare of others, including the Decedent." (*Id.*) However, the Petition is silent as to whether Burris knew, had been told, or should have known about the acts giving rise to the Underlying Lawsuit's negligence claims. In fact, the Petition does not mention Burris at all.

Accordingly, the Court finds that the Underlying Lawsuit does not allege facts that trigger the Prior Knowledge Exclusion on which Homeland relied. Accordingly, Homeland had a duty to defend Arboretum in the Underlying Lawsuit and breached that duty when if failed to do so.

## B. Duty to Indemnify

### 1. Legal Standard

Unlike the duty to defend—which is determined by the eight-corners rule—the duty to indemnify is determined by the facts actually established in the underlying lawsuit. *D.R. Horton*,

300 S.W.3d at 744. Thus, the duty to indemnify is generally not justiciable until after the underlying lawsuit is resolved, as coverage may turn on facts that are proven. *Id.* at 745.

Here, the Underlying Lawsuit settled before trial. As such, the Court must consider the actual facts relevant to the Underlying Lawsuit and determine whether, as of February 2, 2007, Burris "knew, had been told, [or] should have known" that a claim involving the allegations made in the Underlying Lawsuit could or would be made against Arboretum, or that Arboretum had given notice of same to a prior carrier.

### 2. Factual Background in the Underlying Case

Mr. Thomsen moved into Arboretum as a resident and patient in October 2005. At the time of his admission, Mr. Thomsen was 88 years old and suffered from dementia, requiring full-time care.

On January 30, 2006, Mr. Thomsen, for no known reason, went into the room of a fellow resident, who then assaulted Mr. Thomsen. Arboretum's Administrator and co-defendant in the Underlying Lawsuit, Cynthia Reber ("Reber"), noted in her assessment of the incident that "[d]ue to [diagnoses], neither resident is able to make informed decisions." (Dkt. No. 26, Ex. 2 at HICN 183.) Other reports of the incident by Arboretum nursing staff note that the fellow resident had been a "long-term res[ident]" and "these behavior[s] [were] new." (*Id.* at HICN 141.) Mr. Thomsen, however, had a "[history] of physical aggression." (*Id.* at HICN 174.)

Following the assault, Mr. Thomsen was taken to a local hospital for examination, where he was diagnosed with a facial contusion. The examination noted soft tissue swelling over the left eye and a "fracture of the distal left nasion of undetermined age." (*Id.* at HICN 188.) Mr. Thomsen was discharged the same day with a 15-pill prescription of Lortab for pain and released back to Arboretum.

One week later, Arboretum brought Mr. Thomsen to the same hospital. Mr. Thomsen's medical records provide the following reasons for the visit:

> The patient is an 88-year-old male resident of local nursing home who has been having recurrent falls, increased falls, confusion and mental status changes who was brought to the hospital for evaluation of the above complaints. CAT scan of the brain done in the hospital was significant for an acute right parietal stroke infarct.

(Dkt. No. 26, Ex. 1 at Arboretum 1736.) The records do not mention any injuries related to the assault that had not healed or otherwise link the stroke to the assault, but instead state that "[u]nfortunately this is a completed stroke, and there is not much we can do for this. The risk factor most likely is the atrial fibrillation that he has chronically." (*Id.* at Arboretum 1753.) The records further indicate that Mr. Thomsen was "[w]ell built" and "well nourished," and his skin showed "no hematoma." (*Id.* at Arboretum 1752.) After Mr. Thomsen was discharged from the hospital, he returned to Arboretum.

During the following months, Mr. Thomsen's behavior became increasingly aggressive. For example, chart notes indicate that staff reported that Mr. Thomsen was:

> hollering & threatening to shoot himself & others on 4-27-06. Social worker attempted to interview resident but he is confused and answering inappropriately. Resident's room was checked for sharp objects. Anything that could be turned into a weapon was removed. The Psychiatrist will be seeing resident today.

(*Id.* at Arboretum 1612.) Chart notes also state that on April 28, 2006:

> Social worker and Administrator meet with [responsible party] and daughter. Discussed resident's increase in physical aggression behavior and suicidal statements made by resident. The family was resistant to any type of psychotropic medications. . . . Family does not want resident discharged to psych unit. . . . [F]acility must show responsiveness to any other behavioral issues including but not limited to the options of discharge to psych unit, discharge to another facility, or discharge to family. Administrator explained that physical aggression and suicidal statements are significant incidents and must be addressed.

(*Id.* at Arboretum 1611.) Then on May 2, 2006, a CNA reported that Mr. Thomsen:

> was being aggressive towards [another] CNA. Went into shower room and
> resident was cussing . . . CNA got resident showered, he [was] still cussing and
> hitting. We were drying resident off and resident grabbed CNA's arm & dug
> fingers into her arm, left scratches and now bruises. Got clothes on resident and
> he tried to hit another CNA['s] hand . . . He grabbed my hand and dug his fingers
> into my hand & scratched me. Left marks, not as bad as [other CNA]'s.

(Dkt. No. 21, Ex. 3 at Arboretum 74–75.)

Later that same day, Reber informed Mr. Thomsen's wife that, because of Mr.
Thomsen's physical aggression, Arboretum could no longer provide his residential care. Mrs.
Thomsen began "yelling [at] staff and administrator regarding resident incident refusing to calm
down or leave unit for further discussion of situation." (Dkt. No. 26, Ex. 2 at HICN 157.)[2] "Ms.
Thomsen stated, 'I'm tired of all of you making up lies about my husband. He could not hurt
anyone. He is in a wheelchair and you are making up lies that he tried to beat up the girls.'" (*Id.*
at HICN 151.) Because Mrs. Thomsen's yelling could be heard by other patients, Reber asked
Mrs. Thomsen to move to a non-residential part of the facility. When Mrs. Thomsen refused,
Reber "asked Ms. Thomsen to please not force me to have her removed from the facility by law
enforcement." (*Id.*) Mrs. Thomsen responded that she was "not going anywhere" and told Reber
to "call the police and use your authority.'" (*Id.*) Reber then left to call Mrs. Thomsen's
daughter, Keri Hampton, who was the designated "responsible party" for Mr. Thomsen's
relationship with Arboretum. Ms. Hampton told Reber that Mrs. Thomsen was upset because of
disagreements concerning Mr. Thomsen's medications and that she would call her mother and
ask her to come speak with Reber in her office. (*Id.*)

Meanwhile, Director of Nursing Pajé Racca, "stayed to keep watch over [Mrs.
Thomsen]." (*Id.* at HICN 157.) At some point, Nurse Racca overheard a cell phone conversation
in which Mrs. Thomsen said, in Nurse Racca's words: "'They will have to get the police to take

---

2. The "resident incident" referred to the previous day's events.

me out of here. You just get ready. Call our lawyer [and] tell him to get ready because we are going to knock the feet out from under this place. They just keep trying to show their authority but they can't do anything. They can't discharge him. Just get ready to fight.'" (*Id.*) Mrs. Thomsen then went to Reber's office and continued to complain about Arboretum's intent to discharge Mr. Thomsen. According to Reber:

> [Mrs. Thomsen] [s]tated, "you all have been trying to get rid of him since he came here. Now you are going to have to deal with my children." I informed Ms. Thomsen that the facility has a right to discharge any resident that is physically aggressive and endangering the safety of himself or others. Informed Ms. Thomsen that with Mr. Thomsen's history, we would have had grounds to discharge him on several occasions, but were trying different [medical] interventions to allow him to remain in the building. Informed Ms. Thomsen that family has not agreed with the [medical] recommendations made by the facility and we were not meeting his needs. Informed Ms. Thomsen that I sympathized with her situation and that the disease process was a very difficult one to deal with. Ms. Thomsen asked if she could go back to unit to sit with him. I informed her that she could do so and I would again contact her daughter. I informed Ms. Thomsen that resident would most likely be discharged to geri psych [geriatric/psychiatric] unit due to endangering the safety of himself and others.

(*Id.* at HICN 151.)

Later that day, Reber and Ms. Hampton had several conversations about, among other things, changes in Mr. Thomsen's medication and Ms. Hampton's interest in talking to Burris. Reber noted that during one of these conversations:

> Ms. Hampton stated that they had "been forgiving" on several incidents including the [January 2006] physical aggression incident. . . . Stated that there has been many incidents of "neglect" and they have overlooked. Asked Ms. Hampton if she felt this way, why would she continue to allow Mr. Thomsen to reside in facility if she felt we were being neglectful. Stated that her mother could only drive here and there were pro's and con's to situation.

(*Id.* at HICN 152.)

At 3:00 P.M., Burris participated in a meeting with the Thomsen family. During this meeting, Ms. Hampton signed release to view Mr. Thomsen's medical records and a release to

send this information to the Baptist Hospital psych unit, which was the facility to which Mr. Thomsen was to be discharged. Ms. Hampton and other family members then viewed Mr. Thomsen's chart for roughly two hours while representatives remained with the chart to witness. Ms. Hampton also gave Reber a list of records of which she requested copies.

The following day, Arboretum discharged Mr. Thomsen. The Resident Transfer Form stated that Mr. Thomsen's primary diagnosis was dementia and provided that the reason for transfer was "Physical Aggression–Endangering safety of self & others." (Dkt. No. 26, Ex. 1 at Arboretum 794.) That same day, Ms. Hampton "called and asked for information on the incident with [the fellow resident]." (Dkt. No. 26, Ex. 2 at HICN 152.)

Arboretum had no further contact with the Thomsen family until June 2007, when Ms. Hampton sent Arboretum a written request for Mr. Thomsen's medical records. The letter described Mr. Thomsen as "deceased," but provided no information about the cause or circumstances of Mr. Thomsen's death. According to Burris, "After Mr. Thomsen's transfer, Arboretum had no knowledge of his health or treatment. . . . This letter was the earliest occasion when Arboretum learned of Mr. Thomsen's death." (Burris Aff., Dkt. No. 26, Ex. 3 ¶¶ 2–3.)

### 3. Other Relevant Facts Related to Knowledge

Homeland has offered evidence of correspondence between BMS Management Services, Ltd. ("BMS") and Arboretum's prior agent, Colemont Insurance Brokers ("Coleman"), referencing the Lloyd's policy in place for the period immediately preceding that of the Homeland Policy. In that letter, dated December 28, 2006, BMS informed Colemont that it "had not been made aware of any claims which may affect the coverage. [BMS had] however been made aware of four separate requests for medical records, to date, no further action ha[d]been taken." (Dkt. No. 21, Ex. 9 at 2.)

Homeland has also offered the deposition testimony of its corporate representative, Maureen Ringland, concerning a conversation she had with Reber shortly after the Underlying Lawsuit was filed. According to Ringland, Reber "told [her] that they had issues with the family, and that they had referred this to their attorney sometime ago, and that had been dealing with this issue for a long time." (Reber Dep., Dkt. No. 21, Ex. 4 at 19:19-22.) Ringland asked Reber "if it had been around the time of the occurrence of January 30th, '06, and she said, 'Yes, we've had our attorney involved. And then she gave me the name of the attorney [Ann Comerio].'" (*Id.* at 19:24-20:3.) Ringland further testified that Reber told her "that the family had been threatening to sue," and while she did not ask how long the family had been threatening to sue, Ringland "understood it was a result of the incident of January 30th, '06." (*Id.* at 20:19-24.)  When asked about a telephone conversation Ringland had with Comerio on January 29, 2008, Ringland stated that when she told Comerio that she was investigating the Underlying Lawsuit on behalf of Homeland, Comerio's "response was something to the effect of Oh, honey, this is not yours. They've been dealing with this for a long time. This is the other carrier's case." (*Id.* at 25:5-10.)

Finally, Homeland has offered evidence that Arboretum had to report the January 2006 incident to the State of Texas and that the local Sheriff's Office was called. (Burris Dep., Dkt. No. 21, Ex. 3 at 40:7–42:15.) These incident reports, as well as some of Mr. Thomsen's medical records, later went through peer review. (Comerio Dep., Dkt. No. 21, Ex. 5 at 10:24-24; 11:1-24.)

**4. Analysis**

As a preliminary matter, the Court finds that Homeland has presented no evidence that Arboretum actually provided treatment that was medically negligent. Specifically, there is no evidence that: Arboretum "fail[ed] to implement, enforce, and/or carry out a care plan for

16

Decedent to prevent and minimize dehydration and diabetic complications;" that Mr. Thomsen "was hospitalize on more than one occasion with dehydration;" that, on his last day at the facility, Mr. Thomsen's daughter found him "slumped over in a wheelchair, covered with vomit, feverish, wheezing;" or that Mr. Thomsen "was transported by ambulance to a hospital for treatment" after he was discharged from Arboretum's care, as alleged in the Underlying Lawsuit. (Compl. ¶ V.)

With respect to the January 2006 incident, Homeland has presented no evidence that the fellow resident who assaulted Mr. Thomsen had "a known propensity toward violence" that should have put Arboretum on notice of his dangerousness; no evidence that Mr. Thomsen suffered any significant or long-term injury from the incident; no evidence that the incident caused Mr. Thomsen's stroke a week later; no evidence that Mr. Thomsen "never recovered from the injuries and neglect inflicted upon him while at Arboretum;" and no evidence that the incident was any way related to Mr. Thomsen's death. (Compl. ¶ V.)

Finally, Arboretum has presented uncontroverted evidence that neither Burris nor any other employee or agent of Arboretum had any knowledge of Mr. Thomsen's condition from the time he was discharged in May 2006 until Arboretum received a letter from Ms. Hampton on June 4, 2007 indicating that Mr. Thomsen had died.

Homeland argues that it is nonetheless entitled to summary judgment on Arboretum's duty to indemnify claim because the following facts prove that Arboretum knew or should have known that the January 2006 incident could or would result in the filing of a claim against Arobretum, even if Arboretum wasn't actually negligent with respect to Mr. Thomsen's care: (1) Arboretum's reporting in 2006 to its pre-Homeland insurer that it had received four requests for medical records; (2) Ms. Hampton's statement to Reber that the family had "been forgiving" on

several incidents and request for Mr. Thomsen's medical records, including records concerning the January 2006 incident; (3) Arboretum's reporting of the January 2006 incident to local law enforcement and to state nursing home regulators; (4) Arboretum's subjecting reports of the January 2006 incident to peer review; (5) Arboretum's knowledge of Mrs. Thomsen's remark that she was going to call her lawyer following news of Mr. Thomsen's discharge; and (6) Arboretum's discussion of the January 2006 incident with its attorney at some point before the Underlying Lawsuit was filed.

In response, Arboretum points out that there is no indication that Mr. Thomsen's records were the subject of one of the four medical records requests referenced by BSM, and there is no evidence that Arboretum viewed the Thomsen family's May 2006 request for Mr. Thomsen's medical records for any purpose other than his continued care at the new facility. Moreover, although the January 2006 incident was reported to the Sheriff's Department and the Texas Department of Health, the record shows that all the documents and incident reports related to this incident were gathered and submitted by Reber. Burris also testified that the Administrator (*i.e.* Reber) was charged with obtaining statements from employees and submitting the required documentation to the State. (Burris Dep. at 45:4-7.) Finally, there is no evidence concerning when these reports went through the peer review process, and attorney Comerio testified that she had "no idea" when this occurred. (Comerio Dep. at 57:18–58:1.)

With respect to Mrs. Thomsen's remark about calling her lawyer, the entire context of the conversation shows that Mrs. Thomsen was angry that Arboretum was discharging Mr. Thomsen, not about the January 2006 incident. Burris also testified that no one in the Thomsen family threatened to sue over the January 2006 incident during the meeting he held with the family on May 2, 2006:

> Q: [O]n 5/2 or 5/3, had Ms. Thomsen or her family members threatened litigation with respect to the [January 2006] incident?
> A: No, sir.
> Q: Had they threatened litigation?
> A: I had read in some notes.

(Burris Dep. at 63:18-23.)

Ringland also testified that, when she initially called Burris after the Underlying Lawsuit was filed, she was referred instead to Reber:

> A: I asked—I was referred to Cindy Reber by Byron . . . [H]e said she had all the information that I needed to complete my investigation.
> ***
> Q: So your conversation with Mr. Burris was regarding who would be your source of information for you investigation?
> A: Yes. If he cannot, then he referred me to who could.
> ***
> Q: [W]as he able to provide answers to any of your questions?
> A: He—all I remember him saying is that it was a problematic family, and for any specifics it would have to come from Cindy Reber.

(Ringland Dep. at 17:2-6, 21-25; 18:24-19:3.)

Based on the summary judgment record, it appears that, at some point before the Underlying Lawsuit was filed, Reber knew or should have known that the January 2006 incident could result in a claim against Arboretum. However, as explained in Part III.A.2.b, *supra*, the only person whose knowledge can be imputed to Arboretum is Burris. Moreover, the relevant point in time is not when the Underlying Lawsuit was filed, but when the Policy application was signed.

The Court finds that Homeland has not presented any evidence that, as of February 2, 2007, Burris *knew or had been told* that the substantive allegations detailed in the Petition would or could result in the filing of a claim against Arboretum. The Court further finds, and Arboretum concedes, that the issue of what Burris *should have known* is a factual question more

19

suitable for determination by a jury. Likewise, a factual issue remains as to whether Arboretum

gave notice to its prior carrier that the January 2006 incident could give rise to a claim against it.

Because genuine issues of material fact exist as set forth above, Homeland's motion for

summary judgment on Arboretum's duty to indemnify claim is denied.

## VI. Conclusion

For the foregoing reasons, it is hereby **DECLARED** that Homeland owed a duty to

defend Arboretum in the Underlying Lawsuit and that Homeland breached that duty.

It is further **ORDERED** that Arboretum's Motion for Summary Judgment on its duty to

defend claim (Dkt. No. 22) is **GRANTED** and Homeland's Motion for Summary Judgment

(Dkt. No. 20) is **DENIED.**

**SIGNED** this 11th day of December, 2012.

JOHN D. RAINEY
SENIOR U.S. DISTRICT JUDGE